Filed 2/2/22  Harkins v. Major League Baseball CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN HARKINS, | |
| Plaintiff and Appellant, | G059949 |
| v. | (Super. Ct. No. 30-2020-01157569) |
| MAJOR LEAGUE BASEBALL et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Orange County, Geoffrey T. Glass, Judge (Retired Judge of the Orange County Superior Court assigned by the Chief Justice pursuant to article VI §6 of the California Constitution.)  Reversed and remanded with directions.

Daniel L. Rasmussen and Matthew K. Brown for Plaintiff and Appellant.

Keker, Van Nest & Peters, Robert Adam Lauridsen, Nicholas D. Marais and Ann S. Niehaus for Defendants and Respondents.

\*                \*                \*

This case involves the alleged tarnishing of plaintiff Brian Harkins' reputation following nearly 40 years of employment with defendant Angels Baseball, LP (dba Los Angeles Angels of Anaheim; hereafter, the Angels). In response to a complaint filed by plaintiff alleging defamation, false light and Labor Code violations, the Angels and defendant Major League Baseball (collectively, defendants) brought a special motion to strike the former two claims pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] Plaintiff contends the trial court's grant of the motion was error because he presented evidence demonstrating a probability of prevailing on the merits of the claims and defendants did not defeat that showing as a matter of law. We agree and reverse the order.

FACTS

Plaintiff had a long-time career with the Angels, beginning in 1981 as a batboy and ending with his sudden firing in early 2020. During the last 10 years of his tenure, he worked as the visiting clubhouse manager. In that role he provided hospitality at Angels Stadium of Anaheim to visiting teams, which included fulfilling their requests for food, drinks, equipment and other items.

In the first few days of March 2020, plaintiff was called to a meeting with the Angels' general manager, Billy Eppler, and its attorney, Alex Winsberg. They advised him he was being terminated and provided two different explanations. According to plaintiff, they first said the team received "some non-descript complaints about [his] 'communication skills' which were affecting [his] management of the clubhouse." Not believing what was said, plaintiff pushed for the true story. In response, Eppler provided plaintiff with a memorandum written by the senior vice-president of on-

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

2

field operations and umpiring for Major League Baseball, Chris Young (the Young memo).

The Young memo, dated three days prior and addressed to all Major League Baseball team owners, chief executive officers, presidents, general managers and field managers, concerned the application of foreign substances to baseballs. It began: "We have received many inquiries from Clubs on the rules regarding the use by pitchers of foreign substances on baseballs. The Official Baseball Rules and Office of the Commissioner's policy in this area are described below." The Young memo proceeded to cite two official rules, Official rules of Major League Baseball, rules 3.01 and 6.02(c)(4)[2], the former concerning the discoloring or damaging of a ball by rubbing it with certain substances, and the latter prohibiting a pitcher from 'apply[ing] a foreign substance of any kind to the ball.'"

Recognizing the Official Baseball Rules did not address all team personnel, the Young memo continued: "Although not expressly addressed in the Official Baseball Rules, under the policy of our office, Club personnel are strictly prohibited from providing, applying, creating, concealing, or otherwise facilitating the use of foreign substances by players on the field. Any persons employed by or acting at the direction of the Club, including but not limited to players, coaches, uniformed personnel, dugout staff, clubhouse staff, and equipment staff, found to have assisted players in the use of foreign substances in violation of the Official Baseball Rules will be subject to discipline by the Commissioner, including suspensions without pay." It concluded by stating it was each team's responsibility to distribute the memorandum to its staff and players and to ensure they understand the rules described.

After showing plaintiff the Young memo, Eppler and Winsberg informed him Major League Baseball had sent a report to the Angels stating he had been "making

---

[2]     All further references to rules are to the Official Rules of Major League Baseball.

an 'illegal substance' that gave an 'unfair advantage' to pitchers 'from visiting ball clubs.'" They referred to the substance as "'(Go Go Juice)," a term plaintiff claimed he never heard before, and said this was the true reason for his termination.

Within two days, news of plaintiff's firing spread through various news media outlets, reaching audiences nationwide. Among the headlines were the following: "Source: Angels fire employee for supplying ball-doctoring substances"; "Reports: Angels fire visiting clubhouse manager for helping opponents illegally doctor baseballs"; "Sources: Angels fire visiting clubhouse manager for aiding opposing pitchers"; "Angels reportedly fire employee for providing pitchers with illegal substances to put on baseballs"; "Angels' visiting clubbie fired for ball-doctoring"; and "Fired Angels employee Bubba Harkins sold 'Go Go Juice' that pitchers put on baseballs."

Plaintiff filed suit against the Angels and Major League Baseball, alleging defamation and false light against both, as well as labor code violations against the Angels.

Defendants responded by filing a special motion to strike the defamation and false light causes of action pursuant to the anti-SLAPP statute. They argued the claims arose from protected activity because the statements on which they were based were made in furtherance of free speech rights on an issue of public interest and plaintiff could not demonstrate a probability of succeeding on the merits.

Plaintiff opposed the motion. He agreed the causes of action fell within the first prong of the anti-SLAPP statute; namely, protected activity. However, asserted as to the second prong, he had demonstrated a probability of prevailing on the merits. Plaintiff submitted a plethora of evidence to support his position, including declarations, expert opinions, news media articles and social media activity.

A declaration from plaintiff explained the circumstances of his firing and detailed the origins and history of a mixture he would make that pitchers liked to use to get better control of their pitches—a mixture he referred to as the "sticky stuff." He

4

relayed that a former Angels' pitcher taught him to mix three substances found in "every clubhouse in every baseball team" — rosin, pine tar and hard pine tar — for use by Angels pitchers to improve their grip on the ball. The mixture eventually became known throughout Major League Baseball. Players from visiting teams at Angels stadium began requesting he make it for them, as did players from teams throughout the league. He prepared it for Angels pitchers as well, with a jar of it "included in the Angels' bullpen bag, along with sunscreen and other sticky substances." Plaintiff did so, never labeling it, selling it or applying it to baseballs himself, but often receiving a gratuity in return as he did with other hospitality gestures performed. The declaration also conveyed that "[m]any people within the Angels organization knew about the [s]ticky [s]tuff," many Angels pitchers used it, many Angels coaches encouraged its use by pitchers.

Additional declarations came from former Major League Baseball players Wallace ("Wally") Joiner and Michael ("Mike") Sweeny, a former visiting clubhouse manager for the Chicago White Sox, Gabe Morell, and a former Angels home and visiting clubhouse employee, Vince Willet.

Joiner and Sweeny relayed rosin and pine tar are "found on every Major League Baseball field, in every bullpen, and in every clubhouse." Based on their decades of experience, they explained "pitchers are permitted and encouraged to use rosin . . . to make their fingers tacky and improve grip on the ball," and "batters use pine tar . . . in order to keep the bat from slipping from their hands and causing major injury." Specifically with respect to the Angels, Sweeny noted many Angels pitchers used the sticky stuff. Joiner added: "Many people within the Angels organization knew about the mixture of rosin and pine tar [plaintiff] used to make for pitchers. Many Angels pitchers used it over the years. Many Angel[s] coaches have encouraged its use by pitchers over the years. Many Angel[s] position players have encouraged its use by pitchers over the years. Why? It makes the game safer."

5

Morell and Willet echoed the pervasive nature of the use of rosin and pine tar by pitchers throughout the league and the safety related reasons for it. They also confirmed "[t]he use of pine tar by pitchers has been easily observable by umpires, managers, coaches, players, fans and officials of Major League Baseball." In Willet's experience, the home team would be the one to purchase and provide the two substances to both the home and visiting teams. He further stated during his tenure with the Angels, plaintiff made the sticky stuff for the Angels' pitchers and a container of it was always included in the Angels' bullpen bag.

Three experts provided declarations in support of plaintiff's opposition. The first, a social media intelligence and cyber investigations expert, detailed the results of his investigation into news media and social media articles and postings concerning plaintiff's termination. The second, experienced in public relations, marketing, communications, image repair and reputation management, detailed the audience reach of news stories concerning plaintiff's termination. He also opined that (1) in light of journalist ethics, the sources of information cited in the news stories necessarily were affiliated with Major League Baseball and/or the Angels; (2) plaintiff has suffered a wide variety of reputation related damages that he will never be able to entirely eliminate; and (3) the cost of online reputation management services aimed to repair his reputation, to the extent possible, will exceed $4 million. The third, a forensic accountant, provided an estimate of plaintiff's economic damages.

Defendants did not submit any evidence in connection with their motion. They argued plaintiff failed to make the requisite showing because the statements at issue were true, the communication from Major League Baseball to the Angels was privileged under the common interest privilege, the communication from the Angels to plaintiff was not made to a third-party and the evidence did not link any authorized Major League Baseball or Angels representative to the statements in the news media.

The trial court held a hearing, took the matter under submission and issued an order granting defendants' motion in its entirety based on reasoning consistent with defendants' assertions. Plaintiff timely appealed.

DISCUSSION

Plaintiff contends his evidence met the requisite threshold for defeating the anti-SLAPP motion notwithstanding the defenses claimed by defendants. He identifies the statements at issue as: (1) the initial communication from Major League Baseball to the Angels regarding plaintiff's purported activities; (2) the statements made by Eppler and Winsberg to plaintiff during the meeting in which they terminated his employment; and (3) the comments in news articles and social media about plaintiff and his termination. Defendants assert plaintiff's evidence was lacking in many respects. We conclude the evidence presented by plaintiff was sufficient to meet his burden at this early stage of the litigation and defendants did not defeat that showing as a matter of law.

*Anti-SLAPP Legal Principles and Standard of Review*

"The Legislature enacted section 425.16 in response to 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' [Citation.] These lawsuits prompted the Legislature to declare that 'it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' [Citation.] To limit such risks, the anti-SLAPP legislation provides a special motion to strike 'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.' [Citation.] In 1997, the Legislature amended the statute to provide that, directed to this end, the statute 'shall be construed broadly.'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 (*Rand*).)

7

"The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure. [Citations.] A court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff has not established 'a probability' of prevailing on the claim. [Citation.] [¶] A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact arise from that conduct [citation]."[3] (*Rand, supra*, 6 Cal.5th at pp. 619-620, italics omitted.) "'If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.'" (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 370 (*Cross*).)

"On appeal, we review the motion de novo and independently determine whether the parties have met their respective burdens. [Citations.] . . . [W]e consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' [Citation.] However, we do not weigh credibility or compare the weight of the evidence." (*Cross, supra*, 197 Cal.App.4th at p. 371.)

*Probability of Prevailing, Generally*

"[A]lthough by its terms section 425.16, subdivision (b)(1) calls upon a court to determine whether 'the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim' . . . , past cases interpreting this provision establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than

---

[3] This opinion does not address the first prong of the anti-SLAPP analysis because the parties agree the statements at issue are protected activity, as defined by the statute. (§ 426.15, subd. (e).)

8

not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714, (*Taus*).) Hence, "'a plaintiff responding to an anti-SLAPP motion . . . "must demonstrate that the complaint is both legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'" (*Id.* at p. 713-714.) "The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.)

At this early stage, "the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) "[T]he defendant's evidence is considered with a view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element." (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585.)

*Plaintiff's Defamation Cause of Action*

Defamation is an invasion of a person's interest in his or her reputation. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 (*Smith*).) It consists of (1) the intentional publication of a statement of fact which is (2) false, (3) unprivileged, and (4) has a natural tendency to injure or which causes special damage. (*Taus, supra*, 40 Cal.4th at p. 720.)

We begin where the parties do, truth or falsity of the disputed statements. Truth is a complete defense to defamation liability irrespective of any bad faith or malicious intent by the defendant. (*Smith, supra*, 72 Cal.App.4th at p. 646.) It is defendants' burden to show the truth of the statements. (*Ibid.*) They need not prove the

literal truth of every word; slight inaccuracies are irrelevant "'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.'" (*Id.* at pp. 646-647.)

There are three subject based categories into which the disputed statements fall. The parties refer to them as the "illegal substances" statements, the "treason accusation" and the "baseball doctoring" claims. We consider each in turn.

The "illegal substances" statements claimed plaintiff had been making, distributing, and/or selling an "illegal substance." Plaintiff presented evidence the sticky stuff he produced was made from substances (rosin and pine tar) which are found on every professional baseball field — clubhouses, pitcher mounds, and bullpens included. ~ Additional evidence showed: it was used for decades by many pitchers throughout the league; the use of rosin and pine tar by pitchers was pervasive and encouraged by coaches and players alike;~ team managers, umpires and Major League Baseball officials were aware of such use;~ and only on "extremely rare occasions," in the last four decades, did an umpire eject a pitcher from a game for use of pine tar with each instance being preceded by an objection from an opposing team manager. This evidence tends to show the sticky stuff was not "illegal."

Defendants argue the sticky stuff was, in fact, illegal because it was prohibited by two official rules of Major League Baseball — rules 3.01 and 6.02(c)(4) — and the Major League Baseball policy cited in the Young memo.

Rule 3.01 provides, "No player shall intentionally discolor or damage the ball by rubbing it with soil, rosin, paraffin, licorice, sand-paper, emery-paper or other foreign substance." The language of this rule expressly targets the conduct of a player, prohibiting a player from doing certain things with the listed substances. It does not prohibit the existence or use of the substances other than using them to intentionally damage or discolor the ball. Thus, it does not demonstrate the truth of the "illegal substance" statements.

10

Similarly unavailing is rule 6.02(c)(4)-(7), which prohibits pitchers from, inter alia, "apply[ing] a foreign substance of any kind to the ball;" "defac[ing] the ball in any manner;" throwing a shine ball, spit ball, mud ball, or emery ball; "hav[ing] on his person, or in his possession, any foreign substance;" or "attach[ing] anything to either hand, any finger or either wrist (e.g., Band-Aid, tape, Super Glue, bracelet, etc.)." (Rule 6.02 (c)(n), off.com.) This rule focuses on the conduct of pitchers. The plain language does not indicate it applies to anyone else, and it does not state any substance is entirely prohibited from the game.

Defendants' last resort is the Major League Baseball policy mentioned in the Young memo. It stated: "Although not expressly addressed in the Official Baseball Rules, under the policy of [the Major League Baseball] office, Club personnel are strictly prohibited from providing, applying, creating, concealing, or otherwise facilitating the use of foreign substances by players on the field." This policy does not demonstrate the truthfulness of the "illegal substance" statements as a matter of law. First, it does not specify what constitutes a foreign substance. Given the evidence showing rosin and pine tar were used pervasively throughout the league and available to players at every field notwithstanding knowledge of them by those charged with enforcing the rules, there is room to argue the sticky stuff was not a foreign substance. Second, whether the foreign substance policy, which Major League Baseball expressly recognized was *not* an official rule, would be construed by a reasonable person to make foreign substances "illegal" is arguable. Third, contrary to defendants' assertion, there is no evidence the policy "had long been in place." The evidence suggested the contrary. Rosin, pine tar and the sticky stuff had been used by players for decades, with Angels coaches and management, as well as those from other teams, knowing their source and encouraging their use without being subject to discipline. To the extent the policy was "new," plaintiff arguably did not violate it because evidence showed he did not engage in any of the purportedly

11

proscribed activity in the three days between the date the Young memo issued, and plaintiff's termination.

Next are the "treason accusations," which included statements plaintiff provided the sticky stuff to opposing players which gave an "unfair advantage" to visiting teams at Angels stadium and created an "uneven playing field." Without much explanation, defendants claim the "gist" of these statements was true, thus the truth defense applies as a matter of law. We disagree. Plaintiff submitted evidence demonstrating the person who originally taught him how to make the sticky stuff was an Angels' pitcher who used it. Plaintiff made and distributed the sticky stuff to Angels' pitchers for decades and a container of it was always included in the Angels bullpen bag. Such evidence is sufficient to establish a prima facie case of falsity.

The third category of statements claimed plaintiff was terminated for "doctoring" baseballs. But there is no evidence plaintiff did anything to balls, and defendants do not claim he did. Rather, it presently appears undisputed plaintiff simply made the sticky stuff and provided it to others.

In sum, plaintiff adequately demonstrated the disputed statements were false.

Focusing next on the initial communications from Major League Baseball to the Angels about plaintiff's alleged activities, defendants contend there is no actionable defamation because the statements are subject to the common interest privilege. Plaintiff argues defendants failed to meet their burden of demonstrating the privilege's applicability and, alternatively, it does not apply because the evidence shows malice on the part of Major League Baseball. We do not reach the issue of malice because defendants failed to produce or identify evidence showing the privilege applies in the first instance.

[Civil Code section 47, subdivision (c)(1) extends a conditional privilege against defamation to statements made without malice on subjects of mutual interests.

12

[Citations.] [It] is 'recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest.' [Citation.] The 'interest' must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest. [Citation.] Rather, it is restricted to 'proprietary or narrow private interests.'" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.)

Contrary to defendants' assertion, plaintiff does not bear the burden on the issue of privilege. Even in the anti-SLAPP context, the defendant "bears the initial burden of *establishing* that the statement in question was made on a privileged occasion." (*Taus, supra*, 40 Cal.4th at p. 721, italics added); see *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931, fn. 16 (*Kashian*) [plaintiff does not have initial burden of showing common interest privilege is inapplicable]; See also *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676 [anti-SLAPP defendant bears evidentiary burden on defenses to plaintiff's claims].) Here, defendants did not do so. They simply relied on two allegations in the complaint without explanation, and they continue to do so on appeal.

Even assuming arguendo a defendant may rely solely on a complaint's allegations to support a claimed defense in the anti-SLAPP context, the two allegations, alone, do not establish the common interest privilege applies. The allegations on which they rely are: (1) "Major League Baseball . . . is an unincorporated association consisting of thirty Major League Baseball franchises"; and (2) plaintiff "was interviewed [as] part of a [Major League Baseball] investigation into the use of allegedly 'illegal' substances to enhance a pitcher's grip of baseballs being pitched." According to the complaint, the investigation referenced in the latter took place weeks after plaintiff was fired, so it does not shed light on any communications that led up to his termination. And the former generality about Major League Baseball says nothing about the occasion at issue, the

13

parties' interests or how its communication to the Angels relates to any supposed common interest. (See *Kashian, supra*, 98 Cal.App.4th at p. 914 [common interest privilege "'protect[s] communications made in good faith on a subject in which the speaker and hearer share[] an interest or duty"].)

Because we conclude defendants failed to meet their initial burden with respect to the privilege, we do not reach plaintiff's counter assertion the privilege does not apply because the communication was made with malice.

As to the "publication" element of defamation, it is undisputed two out of the three sets of statements at issue were published to third parties. Defendants focus on the statements made by Angels representatives to plaintiff during the meeting in which he was terminated. They argue they are not actionable defamation because they were made to plaintiff himself, not a third party. Plaintiff asserts his burden on the publication requirement was met because evidence showed "he already has been and will be compelled to republish the statements in aid of disproving them" when seeking employment. We agree with plaintiff from a legal and factual standpoint.

Generally, "[a] plaintiff cannot manufacture a defamation cause of action by publishing the statements to third persons; the publication must be done by the defendant." (*Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1284 (*Live Oak*).) There is a limited exception for circumstances in which it was foreseeable the defendant's actions would result in publication to a third person. (*Ibid.*) This includes situations where a plaintiff is "'under a strong compulsion to republish the defamatory statement'" (*id*. at p. 1285), particularly for purposes of disproving it (ibid; see *Bowen v. M. Caratan, Inc.* (E.D.Cal. 2015) 142 F.Supp.3d 1007, 1034-1035).

*McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787 (McKinney), is illustrative of 'self-publication' defamation in the employment context. There, the alleged defamatory statements were made by the defendants to the plaintiff as the basis for his termination. (*Id*. at 792.) The plaintiff shared the content of the

14

statements to prospective employers when he applied for a new job (*ibid*.), something which he described as "required of him as a practical matter." (*Id*. at p. 793.) The court concluded there was a triable issue concerning whether the statements amounted to defamation. (*Id*. at p. 798.) It explained evidence showed the defendants communicated "under circumstances which placed [the plaintiff] under a strong compulsion to disclose the contents of the . . . statements to third parties; it was reasonably foreseeable by [the defendants] that [the plaintiff] would disclose the alleged defamatory statements to third parties; and appellant actually made such disclosures." (*Ibid*.)

Assuming the truth of plaintiff's evidence as we must, the circumstances here are arguably more compelling than those in *McKinney*. During plaintiff's 38-year tenure with the Angels, he established a positive reputation with coaches, managers, players and staff throughout professional baseball. The Angels communicated to him he was being terminated because he made and provided illegal substances to opposing teams which gave them an unfair advantage. His termination came amid widely publicized cheating scandals plaguing major league baseball. In this context, it would be unsurprising for plaintiff's termination to make national news, making it more than reasonably foreseeable plaintiff would feel a strong compulsion to explain the circumstances of his termination to potential future employers to dispel what he believed were false accusations.

And plaintiff provided prima facie evidence of actual self-publication. After he became aware of job openings with two different Major League Baseball teams, he sent a cover letter and resume to each. He received a response from one team indicating his materials were passed on to clubhouse staff for consideration, but thereafter received no additional communications. Given his awareness of openings and the widely publicized nature of his termination, he felt the need to explain things and sent both teams a follow up letter "clarify[ing] what occurred and dispel[ing] falsehoods that were reported publicly."

15

Defendants appear to question the veracity of plaintiff's compelled self-publication due to its timing. The evidence shows plaintiff sent one of the follow up letters just three days before filing his opposition to the anti-SLAPP motion. This contributed to the trial court's conclusion plaintiff's evidence was "speculative." But the court's role at the anti-SLAPP stage is not to weigh evidence or judge credibility. (*Cross, supra*, 197 Cal.App.4th at p. 371.) Those duties lie within the province of the trier of fact. Viewing the evidence in the light most favorable to plaintiff, as we must, we conclude plaintiff's showing at this stage regarding publication was sufficient.

Defendants next contend the comments about plaintiff's termination in news articles are not actionable against them as a matter of law because plaintiff did not show they are attributable to authorized representatives of the Angels or Major League Baseball. So their argument goes, respondeat superior liability is premised on actions of an employee or agent in the course and scope of employment, since the news articles cited anonymous sources and some indicated the sources said they were unauthorized to comment on the matter, thus defendants cannot be held responsible for the comments published within the articles.

We agree with plaintiff there is sufficient circumstantial evidence connecting the statements to defendants to allow his case to proceed. Most of the news articles were published no more than two to three days after plaintiff's termination. They detail the reasons for his firing and use the same language allegedly used by the Angels and Major League Baseball to describe what they believed plaintiff had been doing. At least one even refers to the sticky stuff as "Go Go Juice," a term which plaintiff stated he never used and never heard prior to the meeting at which he was terminated. Because plaintiff stated he did not speak publicly about his termination, a reasonable inference may be drawn that the media's anonymous sources were one or more persons from Major League Baseball and/or the Angels with intimate knowledge of the situation. This is corroborated by some of the articles which expressly refer to the sources as people

16

"familiar with the decision," "with knowledge of the situation," or "with knowledge of the matter …."

The evidence emphasized by defendants does not defeat plaintiff's claim as a matter of law.  Although plaintiff alleged in his complaint he spoke to family members and evidence suggests he communicated with others as well, that does not eliminate the Angels or Major League Baseball as possible sources of the statements.  There is no evidence as to the timing of plaintiff's communications with his family, and it appears the other communications took place after the news articles were published.  At best, this additional evidence creates a triable issue of fact.  (*Cross, supra*, 197 Cal.App.4th at p. 371 [court does not weigh evidence at anti-SLAPP stage].)  Similarly, although one of the articles indicates the sources who provided the information said they "were unauthorized to comment publicly," determining the veracity of that representation is a matter to be considered at a later stage by a trier of fact.  (*Ibid.* [no credibility determinations at anti-SLAPP stage].)

*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, cited by defendants, is inapposite.  At the anti-SLAPP stage in that case, the Court of Appeal evaluated whether the plaintiff could have met its burden of proving the statements at issue were made with malice if limited discovery had been allowed.  (*Id.* at p. 121.)  Because the alleged speaker was a public figure (*id.* at p. 115), the plaintiff needed to demonstrate constitutional malice, including the speaker's identity, through clear and convincing evidence (i*d.* at p. 114).  The court concluded the plaintiff could not have met the high burden even with the evidence he believed would be uncovered through discovery.  (*Id.* at pp. 121-124.)  Here, in contrast, plaintiff need only demonstrate minimal merit, and he did as much.

As to the last element of defamation, plaintiff presented evidence the statements at issue had a natural tendency to injure and caused special damage.  Defendants did not claim otherwise.

17

*Plaintiff's False Light Cause of Action*

"'False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.'" (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1264.) Plaintiff's false light cause of action is based on the same alleged statements as the defamation claim, and defendants do not raise any separate arguments or defenses. Under such circumstances, the false light claim "'stands or falls on whether it meets the same requirements as the defamation cause of action.'" (*Ibid.*) Consistent with our conclusion concerning defamation, it was error for the trial court to grant defendants' motion as to this cause of action.

*Attorney Fees*

In light of our conclusion concerning the anti-SLAPP motion, we agree with plaintiff the subsequent attorney fees award granted to defendants based on their success must be vacated.

## DISPOSITION

The order granting defendants' anti-SLAPP motion is reversed. On remand, the trial court shall enter a new order denying the motion in full and, as a result, the April 23, 2021 order granting attorney fees to defendants shall be vacated. Plaintiff is entitled to his costs on appeal.

MARKS, J.*

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.